[No. A049965. First Dist., Div. Two. Mar. 18, 1991.]

GLYNIS PISTONE, Petitioner, v.
THE SUPERIOR COURT OF CONTRA COSTA COUNTY,
Respondent;
NEW CAR DEALER ASSOCIATES, Real Party in Interest.

[Opinion certified for partial publication.*]

---

*Pursuant to rules 976 and 976.1, California Rules of Court, this opinion is certified for publication with the exception of parts I and III.

COUNSEL

David J. Larkin for Petitioner.

John A. Fetto as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Duane W. Grummer, Shelley M. Lean and Lynch, Loofbourrow, Helmenstine, Gilardi & Grummer for Real Party in Interest.

OPINION

**SMITH, J.**—We issued an order to show cause to review a summary adjudication granted in favor of real party in interest New Car Dealer Associates (NCDA), a defendant in this action brought by petitioner Glynis Pistone (Pistone) against NCDA and Diablo Leasing Company, doing business as Walnut Creek Nissan (Nissan), over defendants' denial of claims Pistone made under a vehicle service contract (VSC) she entered into when purchasing a used car from Nissan. We conclude that triable issues of fact preclude summary adjudication and consequently issue a peremptory writ of mandate.

## BACKGROUND

Pistone bought a used Oldsmobile from Nissan on May 13, 1986. For an additional $525, she paid for a used-car service contract (the VSC) under which Nissan (the "Dealer" or "Selling Dealer") would repair or replace covered components should a "mechanical breakdown" occur within the policy term. Work could be done by the selling dealer or any authorized dealer, but all work required the owner to get prior authorization by the dealer or its "Administrator," identified in the VSC by office address and telephone numbers. The VSC recited that the administrator was "not a warrantor or contractor hereunder," did "not assume and specifically disclaims any liability to you for any benefits provided herein" and would be liable "only to the dealer, in accordance with their separate agreement."[1] The VSC identified Pacific Indemnity Company (Pacific Indemnity) as underwriter.[2]

The "separate agreement" between the dealer and administrator is not explained in the VSC and was evidently not disclosed to Pistone. It was an "Administration Agreement" by which NCDA administered a "program" of VSC's offered by Nissan to car buyers. Under the agreement, Nissan agreed to use forms and contracts furnished by NCDA and to follow a dealer procedure manual also produced by NCDA. The agreement required

---

[1] Relevant excerpts from the VSC are as follows:

"WHAT TO DO IF REPAIRS ARE NEEDED

"In the event of a mechanical breakdown, you should follow this procedure:

"(1) Return the vehicle to the Selling Dealer. If this is not possible or practical, call the Administrator for instructions at the number listed.

"(2) Provide the repairing dealer or the Administrator with evidence that the required maintenance has been performed.

"(3) Pay the applicable deductible and the charge for any items for which no coverage is provided.

"Repairs or replacements may be made by any factory authorized dealer for the owner's make of car or properly licensed repair facility provided the owner has obtained prior authorization of the selling dealer or the Administrator for such repairs. Owner should submit the repair order, together with the parts which failed, to the dealer or the Administrator . . . . In the event that covered repairs cannot be performed by the selling dealer, call or write the Administrator. The Administrator does not assume and specifically disclaims any liability to you for any benefits provided herein. The liability of the Administrator is only to the dealer, in accordance with their separate agreement.

"ADMINISTRATION

"For information or claims assistance please call Administrator: [¶] California: 800-772-2621 [¶] Nationwide: 800-227-2940 [¶] The Administrator is not a warrantor or contractor hereunder. For information, write Administration Offices: [¶] P.O. Box 2649, Oakland, California 94614"

[2] "UNDERWRITTEN BY PACIFIC INDEMNITY COMPANY: If you have submitted proof of loss of a covered mechanical breakdown, or you have submitted a cancellation request, and you did not receive proper reimbursement within 60 days you are entitled to notify Pacific Indemnity Company at 51 John F. Kennedy Parkway, Short [illegible] N.J. 07078."

Nissan to "consult Administrator for prior approval in advance of repairing a customer claim" (*sic*) under any VSC.[3]

Pistone's Oldsmobile developed engine trouble during the warranty period, requiring repairs, and she ultimately made a claim against her VSC for nearly $3,600. The work was done at an Oldsmobile dealership rather than Nissan, allegedly because Nissan could not service her car. She made her claim directly to administrator NCDA, as provided for in that situation, but NCDA, for reasons not important here, denied it.

Pistone then filed this action against NCDA, Pacific Indemnity and Nissan, allegedly after trying without success to contact Pacific Indemnity at the address listed in the VSC (see fn. 2, *ante*). Her third amended complaint (hereafter complaint) contains eight causes of action against NCDA, six of which concern us here: breach of the VSC (first), breach of the VSC's

[3] The agreement reads in part as follows:

"Dealer desires to offer to purchasers of vehicles sold by Dealer extended service contracts (hereinafter referred to as Contracts), providing for the repair of the vehicle for a specific mileage term and/or time period, and desires that said Contracts shall be soundly financed, properly performed and prudently administered. All of such activities are hereinafter referred to as 'Program'.

"Accordingly, it is agreed:

"1. Dealer retains Administrator to administer and coordinate Dealer's Program, and Administrator accepts and undertakes to perform the services hereinafter set forth.

". . . . . . . . . . . . . . . . . . . . .

"3. Administrator will prepare and supply to Dealer, at no cost all required quantities of specially formulated service contract agreements, and will furnish to dealer, without charge, its manual and all supplements thereto, promotional materials, and record, claim, and other forms necessary to implement the Program. Dealer agrees to use only the contracts and forms furnished by Administrator, together with Dealer's standard repair order forms, in connection with this Program.

"4. Within Ten (10) days following the end of each month, Dealer shall report to Administrator, on the form provided, all Contracts sold and issued in the prior month, and shall simultaneously remit to Administrator the amount specified in the attached Current Rate Chart.

"5. Dealer shall consult Administrator for prior approval in advance of repairing a customer claim under a Contract. Dealer shall perform all obligations of each Contract in force. Upon completion of a repair covered by a Contract, Dealer shall file a claim with Administrator, in the form and with the information prescribed in the Manual, within 15 days after completion of that repair.

"Administrator shall preliminarily analyze customers claims for prior approval, shall analyze and investigate all documents received for propriety, and shall cause payments of such amount as is appropriately payable to dealer.

". . . . . . . . . . . . . . . . . . . . .

"8. Administrator shall not be liable to perform any Contract of, or to pay any costs or expenses incurred by Dealer, and Administrator shall not be liable for the quality of any parts or workmanship, nor for bodily injury or property damage claims, nor for any other liability arising from the performance or non-performance by Dealer of any Contract. Dealer agrees to hold Administrator free and harmless from all claims and demands by customers holding service contracts . . . ."

implied good faith covenant (second), tortious denial of the contract (third), bad faith denial of an insurance contract (sixth), negligent misrepresentation (seventh) and fraud (eighth). Each cause of action depends on allegations to the effect that NCDA, though not named as a party to the VSC, in fact was one by virtue of a principal-agent relationship with Nissan during the contracting.[4]

The existence of that agency relationship is key to the ruling on NCDA's motion for summary adjudication of issues (Code Civ. Proc., § 437c, subd. (f)), which we review here. NCDA brought the motion on grounds that its lack of party status to the VSC precluded liability, also urging that the VSC was not a contract of "insurance" for purposes of the sixth cause of action. Pistone and Nissan each opposed the motion. Agreeing with NCDA's position and relying on *Clemens* v. *American Warranty Corp.* (1987) 193 Cal.App.3d 444 [238 Cal.Rptr. 339], the superior court granted summary adjudication on all issues (A through F) affecting NCDA.[5]

This petition followed. We issued an order to show cause, ordered all proceedings stayed pending our review and allowed Nissan to file a brief as amicus curiae.

## DISCUSSION

### I*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

### II

■    Review of a summary judgment or adjudication involves the same three-step process required of the superior court: (1) identify the issues

---

[4] Not affected by the summary adjudication here are related causes of action against NCDA on theories that Pistone was a third party beneficiary of the administration agreement (fourth) and that NCDA was an undisclosed principal to the VSC (fifth).

[5] The court's notice of decision states in part: "[Pistone] has failed to raise a triable issue of fact on the question of whether NCDA is somehow a party to the vehicle service contract or that Nissan was actually the agent of NCDA. The terms of the contract are clear and unambiguous on these issues and cannot be varied by parole [*sic*] evidence."

The court denied summary adjudication as to an issue (G) which affected a ninth cause of action (indemnity) aimed only at codefendant Pacific Indemnity, who joined in the motion. Pacific Indemnity is not involved in these proceedings.

*See footnote, *ante,* page 672.

framed by the pleadings and thus placed at issue by the motion; (2) determine whether the moving party's showing negated the opponent's claims; and (3) determine whether the opposing party demonstrated the existence of triable issues of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].) Our function is merely to determine whether issues of fact exist, not to decide them. We strictly construe the moving party's affidavits and liberally construe those of the opponent, resolving in the opponent's favor any doubts as to the propriety of granting the motion. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46], cert. den. (1989) 490 U.S. 1084 [104 L.Ed.2d 670, 109 S.Ct. 2110].)

*Agency*

We hold that the evidence raised a triable issue of fact whether Nissan was the agent of NCDA in entering into the VSC with Pistone. The existence or absence of agency ordinarily poses a question of fact. Unless the evidence permits only one inference, the question is one for the trier of fact. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 831 [291 P.2d 915, 53 A.L.R.2d 124]; *DeSuza* v. *Andersack* (1976) 63 Cal.App.3d 694, 700 [133 Cal.Rptr. 920]; Civ. Code, § 2295.)

Agency was raised by the pleadings on all affected causes of action. NCDA relied on the VSC's terms to show lack of agent/party status. The VSC calls NCDA an "Administrator" and expressly disclaims any contract liability. However, that same contract refers to the relationship between Nissan and NCDA being governed by the separate administration agreement. That agreement shows, in essence, that NCDA engineered, drafted all documents for and had sole authority to preapprove repair work and approve claims made under VSC's sold by Nissan. Nissan's role after entering into a VSC with a customer and passing along a set amount of the payment to NCDA was essentially limited to submitting claims documents and approval requests for repairs which Nissan itself made—all in conformance with certain NCDA manual procedures which are not in evidence. It is clear from both the administration agreement and the VSC that if Nissan did not do the work (as in this case), it was not involved at all in performing obligations under the VSC. The customer was directed in the VSC to deal directly with NCDA for claims assistance or whenever repairs were not made by the selling dealer (Nissan).

Nissan's general manager in 1986, who managed the finance department which sold the VSC's, declared that Nissan sought approval by phoning in

repair orders to NCDA but had no authority to approve repairs or pay claims. Nissan's authority ended with selling the warranty, collecting a commission and forwarding the money and documents to NCDA headquarters. It frequently became an advocate for irate customers, but it had no authority over VSC approvals or claims.

This evidence taken together raises a reasonable inference that Nissan acted as an agent for NCDA in contracting with customers under the VSC program. Whether Nissan was a coprincipal or just an agent is unimportant to the analysis here. The point is that NCDA may have been more than the mere "administrator" it purported to be under the VSC.

NCDA relies on *Clemens v. American Warranty Corp., supra,* 193 Cal.App.3d 444 (*Clemens*), in which the court upheld a ruling that American Warranty Corporation (AWC), the defendant administrator of a VSC program in that case, was not a party to a VSC signed by the customer (Clemens) and the dealer. *Clemens* held that "[t]he involvement of AWC and [an AWC claims manager] in the VSC, as alleged by Clemens, did not rise to the level of their being parties to the contract." (*Id.,* at p. 452.) The case is easily distinguished since it was a "denial of the claim . . . *by the Dealer"* (italics ours) which was at issue. (*Id.,* at p. 448.) Here, the dealer (Nissan) did not deny the claim and, the evidence shows, had no authority to do so. Only NCDA had that authority. This allows an inference that Nissan, which only sold the VSC and then turned all aspects of performance over to NCDA, was NCDA's agent at the contract's making.

■ NCDA tries to take refuge in the parol evidence rule, urging that the VSC language describing it as an "administrator" was clear and unambiguous and thus precluded admitting extrinsic evidence to contradict those recitals. (See respondent court's decision, fn. 5, *ante.*)

The effort is misguided. First, the rule applies only to "integrated" agreements (see 2 Witkin, Cal. Evidence (3d ed. 1986) Documentary Evidence, §§ 967-974, pp. 915-920), something which NCDA does not address. Moreover, no matter how clear and unambiguous a writing is on its face, the rule allows admitting evidence to resolve *latent* ambiguity (*id.,* § 977, p. 923, § 983, p. 929), to prove fraud (§ 999, p. 945) and to reveal an undisclosed principal or party in interest (§ 1010, pp. 953-954). (Code Civ. Proc., § 1856, subds. (e), (g).)

More fundamentally, contract recitals of the existence or absence of agency, while relevant, are never determinative. (See 2 Witkin, Summary of Cal.

Law (9th ed. 1987) Agency and Employment, § 32, pp. 46-47; *Tieberg* v. *Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 952 [88 Cal.Rptr. 175, 471 P.2d 975] [terminology used in an agreement is not conclusive, even in the absence of fraud or mistake].) The cases freely allow parties to contradict "clear" contract language and show their actual relationships. (*Mark Hopkins Inc.* v. *Cal. Emp. etc. Com.* (1948) 86 Cal.App.2d 15, 17-18 [193 P.2d 792]; *Anderson* v. *Badger* (1948) 84 Cal.App.2d 736, 742 [191 P.2d 768]; *J. I. Case Co.* v. *Redfern* (1933) 133 Cal.App. 173, 175-176 [23 P.2d 791].)

### *"Insurance"*

■    The agency issue takes on a new twist in the sixth cause of action, for bad faith breach of an insurance contract. The issue is whether NCDA, by its relationship with Nissan, was selling "insurance" under Insurance Code section 116 (hereafter section 116).[6] Contrary to NCDA's protests, this issue was squarely raised below. Page 13 of the complaint alleges in part: "Defendant NCDA in issuing the service contract became an insurer of Plaintiff's vehicle under CA Insurance Code Sec 116(d)."

Subdivision (b) of section 116 defines warranty contracts of the sort at issue here as automobile "insurance" for code purposes. However, subdivision (c) exempts sales of contracts "covering only defects in material and workmanship" sold for "a separately stated charge" as long as the sales are "incidental to the business of selling or leasing automobiles" and the maker "has an insurance policy with an admitted automobile insurer providing coverage for the making of those conetracts." Subdivision (d) states that "doing . . . any business . . . described in this section in a manner designed to evade the provisions of this section is the doing of an insurance business." (See fn. 6, *ante*.)

---

[6] Section 116 provides in part:

"(b) Automobile insurance . . . includes any contract of warranty, or guaranty which promises service, maintenance, parts replacement, repair, money or any other indemnity in event of loss of or damage to a motor vehicle or any part thereof from any cause . . . .

"(c) The making of a contract covering only defects in material and workmanship . . . in exchange for a separately stated charge where it is merely incidental to the business of selling or leasing automobiles, shall not be deemed insurance, provided, that the maker of the contract has an insurance policy with an admitted automobile insurer providing coverage for the making of those contracts.

". . . [T]he contract shall conspicuously state the name and address of the licensed underwriting insurer and contain a statement that the holder shall be entitled to make a direct claim against that insurer upon the failure of the maker to pay any claim within sixty days after proof of loss has been filed with the maker . . . .

"(d) The doing or proposing to do any business in substance equivalent to the business described in this section in a manner designed to evade the provisions of this section is the doing of an insurance business."

Pistone, backed by amicus curiae Nissan, argues that the evidence supports a reasonable inference that NCDA used the administration agreement and VSC program, coupled with an agency relationship with Nissan, to escape section 116's reach. In other words, by characterizing itself as an "administrator" and having Nissan sign all of the VSC's, NCDA created a front to avoid having its business deemed automobile "insurance."

We have already held that a reasonable inference of agency arose. It follows that NCDA could be found a principal to the VSC's and that the purported "administrator" arrangement thus masked a direct sale of automobile insurance by NCDA. No argument is made that *NCDA*'s sales of VSC's under such a theory were "merely incidental to the business of selling or leasing automobiles" or otherwise fell within the exemption of section 116, subdivision (c). No one addresses what state of mind by NCDA might be required to satisfy subdivision (d)'s language, "designed to evade" (see fn. 6, *ante*), and we find no case law on point. However, assuming in NCDA's favor that a purposeful deception is needed, such an inference reasonably arises. The ostensible "administrator" relationship and resulting agency, while conceivably unintended, also reasonably suggest evasion of the law. A factual question is posed.

NCDA again relies on *Clemens, supra,* 193 Cal.App.3d 444, where the court rejected an argument that AWC engaged in the business of insurance through its administration of the dealer's VSC's. The court stated: "[T]he mere fact the Dealer appointed AWC as administrator did not transform AWC into an insurer. It would be anomalous and inconsistent to hold that while the Dealer who incidentally sold the VSC was not an insurer, AWC, as the Dealer's appointee to administer said VSC, was engaged in the business of insurance." (*Id.*, at pp. 454-455, fn. omitted.) *Clemens* is distinguishable on at least two fronts. First, there was no suggestion that AWC was hiding behind the title "administrator" while in fact wielding sole authority to approve work and claims. The agency or alter ego connection was missing. Second, the plaintiff did not rely on section 116, subdivision (d) to support the theory. ■ " '[C]ases are not authority for propositions not considered.' [Citation.] 'Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.' [Citation.]" (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, fn. 2 at p. 128 [89 Cal.Rptr. 601, 474 P.2d 417].)

■ Finally, nothing in the legislative history cited by the parties shows that a nondealer who sells VSC's is exempt from section 116's definition of

"insurance." (See *Clemens, supra,* 193 Cal.App.3d 444, 454 & fn. 7, quoting legislative counsel digest of 1983 amendment.) ■ As summarized in *Clemens,* the section as amended in 1983 was "intended to protect the expectations of consumers who purchase extended service contracts from automobile *dealers* who are subsequently unable to honor their obligations. The new section 116 gave *dealers* a choice between either purchasing some form of insurance or becoming an insurer subject to the provisions of the Insurance Code and regulation by the Department of Insurance." (*Id.,* at p. 454, italics added.) Our conclusion is also consistent with the pre-1983 statute, which classified extended service contracts as automobile insurance if "the maker of the contract did so as a vocation and not merely as incidental to any other business activity." (*Ibid.,* fn. omitted.) NCDA's making of VSC's (if such be found) appears on this record to have been vocational, not incidental to some other business activity.

Any doubt that evasive "administrator" actions are within the reach of the statute is dispelled by legislative history showing that past imprudence and fraud by administrators directly motivated the 1983 amendments.[7]

### III*

. . . . . . . . . . . . . . . . . . . .

### DISPOSITION

Let a peremptory writ of mandate issue directing respondent superior court to vacate its order of May 14, 1990, insofar as it grants real party in interest NCDA's motion for summary adjudication of issues A through F, and to issue a new order denying summary adjudication of those issues consistent with the views expressed in this opinion and in conformance with

---

[7] "[S]ome administrators, it has been charged, have intentionally violated [the] Insurance Code, deprived the state of insurance premium taxes, deceived the IRS and brought into doubt the entire insurance guaranty function. . . . [¶] . . . [¶] Sponsor claims that administrators have utilized the noninsurance provision of ESC's to avoid conformance with prudent procedures. It has been claimed that some administrators have bilked both dealers, who believe they are fully covered under ESC, or covered under a loss deductible fund; and insurers, who realize limited premiums and may be stuck with large losses under 'ultimate loss' policies when administrator reserve funds are depleted or tampered with." (Sen. Insurance, Claims and Corporations Com., Analysis of Sen. Bill No. 1025 (1983-1984 Reg. Sess.) as amended May 11, 1983.)

*See footnote, *ante,* page 672.

Code of Civil Procedure section 437c, subdivision (g). The stay previously imposed shall be dissolved upon the finality of this decision.

Kline, P. J., and Peterson, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied June 27, 1991.